# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| DONALD R. NASH, | ) |
| Petitioner, | ) |
| v. | ) No. 4:12CV1783 TIA |
| TERRY RUSSELL, | ) |
| Respondent, | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Donald Nash's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. A jury found Nash guilty of the 1982 murder of Judy Spencer. He argues that the evidence was insufficient to support the conviction and that the trial court did not allow him to present a complete defense. Nash also seeks to amend the petition to add a new claim and present new evidence. Respondent contends that the claims are procedurally barred and meritless. Respondent further contends that the motion to amend should be denied. After carefully reviewing the briefs and the record, the Court finds that the petition must be denied.

### Background

The Missouri Supreme Court recounted the facts of the case as follows:

Judy Spencer was killed on the morning of March 11, 1982, in a rural area near Salem, where Judy lived with her boyfriend, Nash. On the night before Judy's death, there had been "a large party" in the area where her body was found. Judy's body had been dragged to and dumped in the foundation of an abandoned outhouse and then covered with tree branches and logs. She had been strangled with a shoelace from her shoe and, then, after she died, had been shot in the neck with a shotgun. Some of her clothing had been strewn in the woods near her body, which was discovered partially clothed. It later was determined, however, that there was no evidence of sexual contact or a sexual assault.

The car was thought to have been there since sometime between 9 p.m. March 10 and 7:30 a.m. March 11.

On the day before Judy's death, March 10, she had spent the afternoon and evening drinking and driving around with her friends, including Janet Jones. [Judy's post-mortem blood alcohol content was 0.18 percent.] Judy lied to Nash about drinking that night, saying she was out of town when she actually was drinking at Janet's apartment. Nash went to Janet's apartment to switch cars with Judy, and Janet observed Nash throw Judy's car keys toward her. Judy told Janet that Nash had told her, "This is the last time you'll ever lie to me, bitch." Judy also told Janet, "[Nash] thinks I'm ugly. He doesn't like my hair."

Janet testified that Judy washed and restyled her hair in Janet's sink after talking with Nash that night. Judy went to the home she shared with Nash, and Judy and Nash argued about drinking. Judy then returned to Janet's apartment. Later in the evening, Judy drove off mad and upset, saying she was going to Houston, Missouri.

Nash later told the state trooper who informed him of Judy's death that he had looked for Judy at some time after 8 p.m. March 10. He stated that he had looked for her at the Legion Hall and at the hospital and then had stayed home the rest of the night and did not leave until the next morning. Judy's friend, Christine Colvin, however, testified at trial that she had seen Nash driving through the parking lot of Janet's apartment complex between 11 p.m. and midnight March 10.

Janet also had searched briefly for Judy on the night of March 10. She recalled that Nash had called her around 8:30 p.m., 9:30 p.m., and 10 p.m. that night, stating that he loved Judy and was worried for her safety. The next day at 5:45 a.m., Janet called Nash, who had requested the previous night that she call him so he would not be late to work. Nash called Janet twice later that morning, again stating that he was worried and looking for Judy. He said that he was concerned that Judy would drink and drive and he feared that she would be in an accident or be arrested.

Nash also called Judy's mother, whom he had never called before, on the morning of March 11. He asked if Judy was at her mother's house, and when she said "no," he said "I won't keep you then." He told Judy's mother that he was calling from the telephone at his work and stated that he was looking for Judy.

In the afternoon on March 11, Nash and Janet left Salem and went to look for Judy in Houston. Nash continued to express that he was concerned for Judy. When Nash and Janet later returned to Salem and went to check Nash and Judy's answering machine, they received a call to come to the hospital, where they were informed that Judy had died. Janet had to be sedated, and Nash became upset and cried. Janet and Nash were interviewed separately by investigators, who did not provide details about Judy's death. Nash described Judy's drinking the night before, and he detailed what she had been wearing when he last saw her.

> Janet testified at trial that Nash later appeared heartbroken because of Judy's death. But testimony also revealed that he was involved with another woman within a week of Judy's death.
>
> When Judy's death initially was investigated in 1982, no blood or tissue was found under her fingernails, and no physical evidence linked Nash to the crime scene. He was fingerprinted and was swabbed for gunshot residue, but no gunshot residue was found. He also did not have scratches or marks that would have been consistent with being involved in a physical altercation. There was also no evidence that the tire tracks located in the area where Judy's body was discovered matched Nash's truck.
>
> In May 1982, at the request of law enforcement, Janet recorded a conversation that she had with Nash discussing Judy's death. Janet told Nash that she suspected he was involved in Judy's death. He stated that he did not have an alibi for the night of March 10, and Janet did not ask him about having an alibi for the morning of March 11. He admitted that he had been angry with Judy on the night of March 10, but he also stated, "I'm innocent. They're on the wrong track. They're not going to catch the right guy."
>
> Judy's case laid dormant until 2007, when Judy's sister requested that investigators renew the investigation. Investigators then requested a DNA sample from Nash to compare to DNA evidence found on fingernail clippings taken from Judy's body in 1982. He voluntarily gave a DNA sample, and testing revealed that his DNA was found under the fingernails of Judy's left hand. No DNA profile or evidence of a third person was detected under Judy's fingernails (only Judy's DNA and Nash's DNA was detected).
>
> An information was filed charging Nash with the class A felony of capital murder in violation of section 565.001, RSMo 1978, and punishable under section 565.008.1, RSMo 1978. A jury trial was held, and jurors heard testimony about the events of March 10 and 11, 1982, and about the DNA evidence. The jury found Nash guilty, and the court sentenced him to life imprisonment with no chance for probation or parole for 50 years.

Missouri v. Nash, 339 S.W.3d 500, 504-506 (Mo. banc 2011) (footnotes omitted).

Nash raised four points on direct appeal: (1) the trial court erred in denying his motion to quash the indictment and to dismiss; (2) the trial court erred in denying his motion for judgment of acquittal and motion for a new trial because, among other things, "a conviction resting upon insufficient evidence constitutes a violation of the Due Process Clause of the Fourteenth

Amendment . . ."; [1] (3) the trial court erred when it failed to submit Missouri's circumstantial evidence instruction to the jury; and (4) the trial court erred in granting the state's motion *in limine* because, among other things, "the trial court's exclusion of [Nash's] third party guilt evidence, is . . . violative of the Compulsory Clause of the Sixth Amendment of the United States Constitution . . ." [2]

In affirming, the Missouri Supreme Court found that Nash's DNA was found under Spencer's fingernails to be significant. Nash, 339 S.W.3d at 510-511. The court further stated:

> This DNA evidence was bolstered by the other evidence favorable to the jury's conclusion that Nash killed Judy: he had told her the night before he died, "That's the last time you'll lie to me, bitch"; he was seen driving around Janet's apartment complex at a time after he told police he had gone home for the night on March 10; he was living with Judy but asked Janet to call him and wake him the morning Judy was killed; and he was involved with another woman shortly after Judy's murder.

Nash 339 S.W.3d at 511.

Nash did not file a timely motion for postconviction relief under Missouri Court Rule 29.15. He filed this petition for writ of habeas corpus on October 3, 2012.

### Grounds for Relief

1. There was insufficient evidence to support the conviction, and the Missouri Supreme Court's determination of the facts was unreasonable.

2. The trial court's application of Missouri's "Direct Connection Rule" regarding the Feldman third-party guilt evidence was an unreasonable application of clearly established federal law because it deprived Nash of a meaningful opportunity to present a complete defense.

### Standard

"In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." Lomholt v. Iowa, 327 F.3d 748, 751

---

[1] Resp't Ex. 6 at 40 (Appellant's Br.).
[2] Resp't Ex. 6 at 61.

4

(8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08. Finally, a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record. 28 U.S.C. § 2254(e)(1); Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004).

**Discussion**

1. Ground One

Nash argues that the prosecution's evidence was insufficient to support the conviction under Jackson v. Virginia, 443 U.S. 307 (1979) and that the Missouri Supreme Court's determination of the facts was unreasonable. Respondent argues that the ground is procedurally barred and that it lacks merit.

First, the Court disagrees with the state that the ground is procedurally defaulted. To avoid defaulting on a claim, a petitioner seeking habeas review must have fairly presented the

5

substance of the claim to the state courts, thereby affording the state courts a fair opportunity to apply controlling legal principles to the facts bearing on the claim. Wemark v. Iowa, 322 F.3d 1018, 1020-21 (8th Cir. 2003) (quotation marks omitted). A claim has been fairly presented when a petitioner has properly raised the same factual grounds and legal theories in the state courts that he is attempting to raise in his federal petition. Id. at 1021. Claims that have not been fairly presented to the state courts are procedurally defaulted. Id. at 1022 (quoting Gray v. Netherland, 518 U.S. 152, 161-62 (1996)). Claims that have been procedurally defaulted may not give rise to federal habeas relief unless the petitioner can demonstrate cause and prejudice for the default. Id. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986).

In his appellate brief, Nash argued that the evidence was insufficient under Jackson. Resp't Ex. 6 at 42. Respondent argues that Nash requested the Missouri Supreme Court to evaluate his claim under a standard higher than Jackson. Nash did, but he also argued Jackson. In discussing Nash's claim, the court stated, "Nash also argues that the evidence against him was insufficient to sustain his conviction." Id. at 508. And the Missouri court evaluated his sufficiency claim under the standard stated in Jackson. Nash, 339 S.W.3d at 509. As a result, this claim is not procedurally barred.

Turning to the merits, in reviewing a claim of insufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (1979) (emphasis in original). In applying this

standard, the scope of review is extremely limited. The Court must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and the Court must defer to that resolution. Whitehead v. Dormire, 340 F.3d 532, 536 (8th Cir. 2003).

Viewing this claim in the light most favorable to the prosecution, the Missouri Supreme Court stated:

> The jury, by its verdict, found that the State's expert's testimony suggesting that Nash's DNA from under Judy's fingernails that existed on the night before her murder would have been removed when she washed her hair. It is not this Court's role to reweigh the DNA evidence to contradict the jury's conclusions. See State v. Hampton, 959 S.W.2d 444, 450 (Mo. banc 1997) (refusing to "reweigh the evidence and second-guess" the trier of fact's factual conclusion that was supported by expert testimony). There was sufficient evidence to support the jury's conclusions that Nash's DNA, rather than a third person's DNA, was present under Judy's fingernails because Nash was the last person to have contact with Judy before she was killed.
>
> Additionally, viewing the evidence in the light most favorable to the State, other evidence supported the jury's conclusions that the presence of Nash's DNA was significant in linking him to Judy's death: the investigator who requested that Nash submit to DNA testing testified that Nash appeared to be very nervous at the time and his hands were shaking; he asked the investigator "will you let me know if I am eliminated?"; he told the investigator that he believed a female may have killed Judy, and he "stepped back and stared" at the investigator when he was told the DNA profile was that of a male; and when he was told that his DNA was found on Judy's fingernails and at the crime scene, he said it was not possible and his hands began shaking.
>
> And this DNA-related evidence was bolstered by the other evidence favorable to the jury's conclusion that Nash killed Judy: he had told her the night before she died, "That's the last time you'll lie to me, bitch."; he was seen driving around Janet's apartment complex at a time after he told police he had gone home for the night on March 10; he was living with Judy but asked Janet to call him and wake him the morning Judy was killed; and he was involved with another woman shortly after Judy's murder.

Nash, 339 S.W.3d at 511.

On direct examination, the state's witness, Ruth Ann Montgomery, was questioned about the quantity of the DNA found under Spencer's fingernails and whether hair-washing would remove the DNA:

7

> [Prosecutor]: And let me ask you this. Based on your training and experience that you've described to us here today, do you have an opinion about whether or not DNA that you detected underneath the fingernails would have come from casual contact?
>
> [Defense counsel]: Same objection [foundation] as in chambers.
>
> [Judge]: The standing objection will be allowed. Same ruling.
>
> [Montgomery]: The quantity of DNA, total quantity of DNA, extracted from the fingernails from the left hand, was approximately five nanograms. In the crime laboratory, the optimal quantity to amplify, to take on to amplification, was one nanogram. That is five times what you're looking for to actually give us good, reliable results. It is not considered a low level, low quantity amount of DNA.
> We do oftentimes work with samples – and I have worked with many samples, many swabs that are considered as low level, non-contact DNA such as touch, touching a surface, or holding something, swabbing people's clothing just from skin cells it is not consistent with a low-level sample.

Tr. 677-78.

The prosecutor further asked Montgomery about the effect of hair-washing on the quantity of DNA:

> [Prosecutor]: Now, having detected that quantity of DNA, I want to ask you a question. Do you have an opinion, based on your training and experience, what effect an individual washing his or her hair would have on DNA – any DNA underneath the fingernails remaining after the washing?
>
> [Defense counsel]: Judge, this is part of the continuing objection.
>
> [Judge]: Yes. Same ruling. Standing objection.
>
> [Montgomery]: I would expect that washing your hair, the mechanical manipulation of the scalp or the hair, would remove DNA from underneath the fingernails. Shampoo is a detergent and that is actually one of the ingredients that we use to lyse open the cells, so cells would be lysed during that process.
>
> [Prosecutor]: By "lyse," what do you mean?
>
> [Montgomery]: Broken open. You can actually break open the cells.
>
> [Prosecutor]: Are we talking about breaking open the DNA?
>
> [Montgomery]: Breaking open the cells, which would make the DNA easier to be washed away. I cannot give you a quantity that would or would not persist under the fingernails, but I would expect that it would have a great effect.

8

Tr. 679-80.

On cross-examination, defense counsel asked Montgomery, "You cannot say that washing one's hair would remove all foreign DNA from one's hands or fingernails, can you?" Montgomery replied, "No, I cant." Tr. 696. Further testimony was elicited regarding the quantity of DNA:

> [Defense counsel]: You don't know if Judy Spencer used shampoo on her hair, when she did whatever she did to her hair at Janet Jones' apartment, before leaving to go home and change clothes; am I right?
>
> [Montgomery]: That is correct.
>
> [Defense counsel]: If she did use shampoo, you do not know if the shampoo she used was detergent-based or soap-based, do you?
>
> [Montgomery]: No, I do not know that.
>
> [Defense counsel]: You do not know what kind of contact occurred between [Nash] and Judy prior to her washing or rinsing her hair, whatever she did to her hair, in the kitchen sink at Janet Jones' apartment, do you?
>
> [Montgomery]: No, I do not.
>
> [Defense counsel]:You don't know if the [sexual] contact that they had two days earlier included digital penetration by her of him, do you?
>
> [Montgomery]: No, I do not.
>
> [Defense counsel]:You do not know what kind of contact occurred between [Nash] and Judy after she had shampooed her hair, but before she was killed, do you?
>
> [Montgomery]: No, I do not.

Tr. 698. Montgomery further testified that washing one's hair would be more likely to remove DNA from the surface of the fingers rather than underneath the fingernails. Tr. 696.

In addition, defense counsel asked Montgomery about the reliability of three peer-reviewed, published scientific studies about the presence of DNA in couple's fingernails, the persistence of DNA after multiple hand washings, and the persistence of DNA under the

9

fingernails of people who had been submerged in water. Tr. 689-692. Montgomery testified that the papers are normally and reasonably relied upon by people engaged in her line of work. Tr. 691-92.

The first paper, Defense Exhibit AA, is titled, "The Prevalence of Mixed DNA Profiles in Fingernail Samples Taken From Couples Who Cohabit Using Autosomal and Y-STRs." Tr. 734. That study showed that one's partner's DNA persisted underneath one's fingernails through showers, bathing, hand washing, and dishwashing. Tr. 738. The study also showed that sixty-three percent of females showed evidence of their partner's DNA underneath their fingernails. Tr. 740.

The second study, Exhibit BB, is titled, "The DNA Analysis of Fingernail Debris Using Different Multiplex Systems: a Case Report." Tr. 742. The case study followed a male nurse who had sexually assaulted a female patient by digitally penetrating her vagina. Tr. 742. The victim did not report the incident "for a couple of days." Id. After two days, and after multiple hand washings in a hospital setting, the nurse still had the victim's DNA underneath his fingernails. Id.

The third study, Exhibit CC, is titled, "The Persistence of DNA Under Fingernails Following Submersion in Water." Tr. 741. The study showed that a corpse's body that had been submerged in bathwater still contained foreign DNA despite being submerged for two hours. Id. And it further showed that a corpse submerged in salt water for three hours still showed foreign DNA under its fingernails. Id.

Finally, defense counsel established that Montgomery did not have any experience in extracting DNA from submerged corpses. Tr. 695.

In his defense, Nash presented the testimony of Stephanie Beine, a senior forensic scientist with Genetic Technologies, Inc. Tr. 729. Beine had experience removing DNA from submerged corpses. Tr. 735. Beine testified that she reviewed the scientific studies introduced as exhibits AA, BB, and CC. Tr. 734. After discussing the studies in detail, Beine concluded that the presence of Nash's DNA under Spencer's fingernails was not a "significant finding." Tr. 745.

The Missouri Supreme Court found that the jury was reasonable in relying on Montgomery's testimony to find that "Nash's DNA from under Judy's fingernails that existed on the night before her murder would have been removed when she washed her hair." Nash, 339 S.W.3d at 511. The state court noted that Montgomery testified that "hair-washing, particularly with shampoo, would remove DNA from underneath the fingernails that existed prior to the washing." Id. at 510. The court further noted that Montgomery "did not have an opinion as to what quantity would persist under fingernails following shampooing, but said it would 'have a great effect' in removing DNA." Id.

In reviewing an insufficient evidence claim, this Court is not required to "'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Jackson, 443 U.S. at 318-19 (quoting Woodby v. INS, 385 U.S. 276, 282 (1966) (emphasis in original). Furthermore,

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

Jackson, 443 U.S. at 319 (emphasis in original).

11

Nash makes a compelling argument that the DNA evidence was meaningless and did not prove that he was the last person to see Spencer alive. Were the Court in the position of the jury, it might have reached a different conclusion. That, however, is not the issue before the Court. The Court must resolve all inferences in favor of the state and determine whether *any* trier of fact could have concluded that the DNA evidence was proof of Nash's guilt. And the Court must further give deference to the Missouri Supreme Court's decision.

Giving the state courts the proper deference, this Court cannot say that the Missouri Supreme Court's decision was contrary to federal law or was based on an unreasonable determination of the facts. The jury heard the testimony of both the state's expert and petitioner's expert. The jury apparently chose to believe the state's expert. A rational trier of fact could have decided that Nash was guilty based on the presence of his DNA and the other evidence the Missouri Supreme Court found to "bolster" the DNA evidence, such as Nash's demeanor when asked to provide a DNA sample. The Missouri Supreme Court's determination was not contrary to federal law because it analyzed the issue under the correct federal standard and did not apply it unreasonably. And its decision was not based on an unreasonable determination of the facts because there was at least *some* evidence in the record that tended to show Nash's guilt. As a result, petitioner is not entitled to relief on ground one of the petition.

2. Ground Two

Nash argues that the trial court's application of Missouri's "Direct Connection Rule" regarding the Feldman third-party guilt evidence was an unreasonable application of clearly established federal law because it deprived Nash of a meaningful opportunity to present a complete defense. Specifically, Nash claims the state court violated the Compulsory Process Clause in the Sixth Amendment to the United States Constitution.

Respondent argues that this claim is procedurally barred because Nash did not present it to the Missouri Supreme Court.

In his appellate brief, Nash argued that the test was facially unconstitutional and deserving of strict scrutiny. Tr. 61-62. Each of his arguments pertained to the facial unconstitutionality of the rule. Tr. 62-74.

In this case, Nash makes an "as applied" challenge to the rule. Mem. in Supp. of Pet. for Writ of Habeas Corpus, 61 ("Mem. in Support"). This is not the same claim he made in his appellate brief, and it is not the claim that the Missouri Supreme Court analyzed. The state court's analysis was limited to the constitutionality of the rule and whether it was properly applied by the trial court under state law. Nash, 339 S.W.3d at 513-515. As a result, the claim is procedurally barred because it was not properly presented to the state courts.

Even if this claim were fairly presented, it would not provide habeas relief for Nash. To the extent that Nash claims the Missouri courts failed to correctly apply the Direct Connection Rule, the claim is not cognizable in these proceedings. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

The Missouri Supreme Court explained the Direct Connection Rule as follows:

To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect

13

> than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

Nash, 339 S.W.3d at 513.

Nash's third-party evidence consists of Feldman's fingerprints on Spencer's car, the fact that he denied ever meeting Spencer or was ever in Dent County, the testimony of witnesses who saw Feldman with Spencer a couple of days before the trial, the fact that Feldman carried a shotgun in his vehicle, Feldman's conviction for sex crimes, and Feldman's suicide by shotgun. Mem. in Support, 61.

Nash maintains that the rule was applied in an unconstitutional manner because he "should not have been required to prove unequivocally that Feldman murdered Judy Spencer before being allowed to submit evidence of Feldman's fingerprints on the driver's-side window of her car." Mem. in Support, 67.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. (quotations and citations omitted).

Nash argues that the state court misapplied the rule stated in Holmes. In Holmes, the Court found that the state court's rule, in itself, violated the defendant's right under the Sixth Amendment. Id. at 329-30. The state court "applied the rule that 'where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt' may (or perhaps must) be excluded." Id. at 329

(citing South Carolina v. Holmes, 361 S.C. 333, 342 (S.C. 2004)). The rule was unconstitutional because it looked only at the prosecutor's case and excluded any third-party evidence so long as the prosecutor's case was strong. Id. 329-331.

Holmes is distinguishable for three reasons. First, Missouri's Direct Connection Rule does not prohibit third-party evidence without considering the defendant's evidence. Second, Holmes was decided on the direct appeal of the petitioner. Id. at 321. As such, the legal claim was determined without considering the deference to the state courts required by 28 U.S.C. § 2254. Finally, the third-party evidence in Holmes was much stronger than in this case: witnesses placed the third-party in the victim's neighborhood and another witness testified that the third party confessed to the crime. Id. at 323.

Afforded the proper deference under § 2254, the Court finds that the Missouri Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law. "A state court's evidentiary rulings can form the basis for federal habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir.1996). The Missouri Supreme Court found that the excluded evidence did not connect Feldman to the *corpus delicti* of the crime. Nash 339 S.W.3d at 515. The court further found that the trial court's ruling "was not a decision that was clearly against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration." Id.

This Court disagrees with Nash's contention that the trial court mandated that he prove unequivocally that Feldman committed the murder in order to introduce the evidence to the jury. It is not wholly unreasonable to conclude that the DNA evidence outweighed the fingerprint

evidence because it was found on Spencer's body. And Nash cannot prove that the decision so fatally infected the trial as to deprive him of due process. Nash was permitted to present evidence that the DNA evidence was meaningless in light of the fact that he and Spencer lived together. Even if Nash had been allowed to present the fingerprint evidence, the jury may still have concluded that the DNA evidence proved Nash's guilt. As a result, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law. Nash is not entitled to relief on ground two of the petition.

### 3. Motion to Amend

In his motion to amend, Nash argues that the trial court erred in admitting Montgomery's testimony because it was not based on science and was purely speculative. Nash argues that "new scientific studies published after Nash's conviction have confirmed that a romantic partner's DNA persists underneath one's fingernails even after the research subject intentionally cleans and scrubs her fingernails for the sole purpose of removing DNA." He seeks to expand the record to include the recent tests and a report from a DNA expert who asserts that Nash's DNA was a result of cohabitation and was not related to the murder. Nash also claims that an independent laboratory recently tested Spencer's shoe for DNA and male DNA was found. The DNA did not belong to Nash, but Nash does not have a match for the DNA. He admits that this claim is procedurally defaulted, but he argues that the new evidence shows that he is actually innocent, i.e., that in light of the new evidence, no reasonable juror could have found him guilty beyond a reasonable doubt.

Respondent contends that the motion must be denied because the claim is noncognizable, the limitations period has expired, that the claim does not relate back to the original claims, and that Nash has failed to show that he is actually innocent.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). The fundamental miscarriage of justice exception allowing resolution of a procedurally barred claim on its merits "requires a habeas petitioner to present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted." Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006). "The requirements to establish the requisite probability of innocence are high. [A habeas petitioner] must first come forward with new evidence . . . and then he must show that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). "The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Schlup, 513 U.S. at 328.

Nash has not presented any new evidence that could not have been discovered at trial through due diligence. The new scientific paper and report by a new DNA expert are duplicative of the evidence produced at trial. Nash produced three scientific papers during trial that showed that DNA evidence persists under fingernails despite multiple hand-washings. And Nash was aware of Montgomery's credentials and the speculative nature of her testimony during trial. Defense counsel properly impeached her testimony on cross-examination. Nash could have presented this claim to the Missouri Supreme Court on direct appeal, and he could have presented it in his original petition for habeas corpus. He did neither.

Furthermore, Nash has failed to demonstrate his actual innocence. A reasonable juror could have chosen to rank the DNA evidence underneath Spencer's fingernails higher than the DNA from an unknown person on her shoe, especially in light of the fact that no DNA was found on the shoe string used to strangle Spencer.

Nash also argues that the new claim relates back to the original petition under Rule 15(c). Even if this were true, his claim still fails. "A state court's evidentiary rulings can form the basis for federal habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir.1996). Again, the weaknesses in Montgomery's testimony were brought out by defense counsel on cross-examination. And Nash was allowed to present his own expert who testified that the fingernail DNA evidence was insignificant. Nash was not deprived of due process. The amendment is futile.

For these reasons, Nash is not entitled to habeas relief.

Petitioner has made a substantial showing of the denial of a constitutional right, which requires a demonstration "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" on grounds one and two of the petition. Khaimov v. Crist, 297 F.3d 783, 785 (8th Cir. 2002) (quotation omitted). Therefore, the Court will issue a certificate of appealability on these grounds. The Court does not believe, however, that jurists of reason would find it debatable whether his motion to amend should be grated. Therefore, the Court will not issue a certificate of appealability on that ground. 28 U.S.C. § 2253(c).

Accordingly,

**IT IS HEREBY ORDERED** that Nash's petition for writ of habeas corpus is **DENIED**, and this case is **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Nash's motion for leave to amend the petition [ECF No. 26] is **DENIED**.

**IT IS FURTHER ORDERED** that Nash's motion for a status conference [ECF No. 39] is **DENIED**.

A separate Judgment will accompany this Memorandum and Order.

Dated this   4th   day of February, 2015.

/s/ Terry I. Adelman
TERRY I. ADELMAN
UNITED STATES MAGISTRATE JUDGE